Matter of Department of Social Servs. (2006 NY Slip Op 51103(U))

[*1]

Matter of Department of Social Servs.

2006 NY Slip Op 51103(U) [12 Misc 3d 1168(A)]

Decided on June 7, 2006

Family Court, Nassau County

Lawrence, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 7, 2006

Family Court, Nassau County
In the Matter of Department of Social Services, o/b/o Michael A., B., A Child under Eighteen Years of Age Alleged to be Neglected by T.B. and E.D., Respondents.
NN-00000

KIMBERLY SNOW, ESQ.
Deputy County Attorney
Attorney for the Presentment Agency
Family Court Bureau
HOWARD R. TEICHNER, ESQ.
KELTON & TEICHNER, ESQS.
Attorney for E.D.
KENNETH M. KEITH, ESQ.
KEITH, SHAPIRO & FORD, ESQS.
Attorney for S.R.
MARK O. WASSERMAN, ESQ.
Attorney for T.D.
EILEEN STAPLETON, ESQ.
Law Guardian

Richard S. Lawrence, J.
This was a neglect matter brought against the natural Mother, T.B. (now known as T.D.) and the parent substitute E.D.
The allegations in the amended petition are as follows:
(Paragraph 4a) is not an allegation of neglect, but simply a "boiler plate" paragraph used by the Petitioner stating, in effect, that the following paragraphs constitute neglect.)
4b) On or about 8/6/03, child was interviewed by Judge Burton Joseph from the Family Court [sic: should read Supreme Court] on allegations against respondents. Child stated that respondents repeatedly asked him to disclose information surrounding the meeting with the Judge. Respondents threatened child. Child refused to divulge information to respondents. Child suffered emotional upset at respondents' actions.
4c) Child stated to CPS caseworker that on or about 8/8/03, respondent parent substitute E.D., told him that "he just lost his relationship with his mother" and that he would strangle childnot tell him what he said to Judge. Respondent mother told child that "she was going to lose it and he does not want to see what she is like when she loses it." Respondents' failure to exercise a minimum degree of care, placed said child in imminent danger of his physical, mental and emotional well-being.
4d) Respondent mother, T.B., continued to verbally abuse child by calling him names such as, "little f- and little piece of s-" and also told child, "when you get older you are going to become a serial killer." Child continued to refuse to divulge information shared with Judge Joseph. Child suffers from the acts of respondents evincing a failure of parental skills.
4e) Respondent mother threw child's clothes out of the drawer at him and ordered him to get dressed. Respondents threatened child by telling him they were taking child to a bridge or cornfield and leave him there. Respondents drove child to a bridge and then drove off a few feet. Child became scared and started crying. Child told respondents the conversation he had with the [*2]Judge including that he wanted to be with his biological father and was then allowed back into the car. Respondent's [sic] actions placed child in imminent risk of harm.
4f) Child stated that on 8/4/03, 8/6/03, 8/7/03 and 8/8/03, respondent parent substitute E.D., drove him around to his job where he sees clients in their homes, but leaves child in car with engine running and air conditioner on for long periods of time while he sees his clients in their home. Respondent parent substitute E.D.'s behavior and lack of supervision, placed child in imminent physical danger.
4g) Father, S.R. stated, that on returning to his home on or about 8/10/03, child was crying and trembling and told non-respondent father, incidents enumerated at paragraphs c) through f))[sic].
Respondents became distrusting of child which behavior caused the relationships in the household to disintegreate, contrary to the health and well-being of child.
4i) On or about 9/24/03 caseworker was informed by therapist, Mary Ann McGrath who stated that child's account of incident is credible, although child minimized events of incident.
4j) Respondents admitted that child wants to reside with his biological father.
4k) Non-Respondent father has full custody of child, who resides with him and Parent Substitute Ms. L.M.
With respect to these allegations of neglect, the Court notes that paragraphs 4i), 4j) and 4k) are not in fact allega-tions of neglect, but apparently simply statements of alleged fact; as such, they are irrelevant to any finding this Court may make.
The trial in this matter commenced May 11, 2004 and the last witness was heard on January 17, 2006; there were approximately 25 dates of trial. The extreme length of this trial was due to the vigorous representation, by each attorney, of his or her respective client, as well as the number of witnesses. Each witness was subject to vigorous cross-examination, which of course contributed to the length of this trial. At the conclusion of testimony, counsel submitted memoranda of law. However, counsel for the Mother did not serve other counsel with copies of his memorandum, even though all counsel were ordered to do so. At the request of this Court, that attorney was contacted on two occasions by telephone, and also by letter dated December 20, 2005, which requested proof of service of the memorandum. That letter (by this Court's Court Attorney) further stated that the memorandum would not be shown to the Judge nor considered by him, without proof of service. As of the date of this decision, this Court has heard absolutely nothing from that attorney, and no proof of service has ever been submitted. Accordingly, the memorandum submitted by that attorney will not be considered by this Court.
Prior to the commencement of this hearing, and with respect to a companion custody matter, this Court granted the Father temporary custody by order dated May 14, 2004. (Justice [*3]Burton S. Joseph, Nassau County Supreme Court, had previously issued a tem- porary order, dated September 3, 2003, which suspended visitation by the Mother, pending a complete CPS report.)
The custody and visitation case originally was with Judge Burton S. Joseph, but in view of the CPS investigation and the neglect proceeding, it was transferred to this Court on February 6, 2004.

 TESTIMONY
 TESTIMONY OF MARGARET MARSLOW
The Presentment Agency's first witness was Margaret Marslow, who has been employed as a Child Protective Services (CPS) case- worker for the Nassau County Department of Social Services for one and one-half years. After testifying about her credentials, she stated that this case was assigned to her on August 22, 2003 and her first contact was on August 27, 2003, with the child Michael and the Father's girlfriend, L.M. This witness testified that, regarding the allegations at issue in this matter, Michael met with Judge Joseph and that each of the Respondents wanted him to tell them what happened at that interview. In addition, E.D. specifically wanted to know what Michael had told the Judge and Michael refused to tell him. Mr. D. then stated he would "strangle" him. The Mother then asked what had happened with the Judge and when Michael refused, she said she had "lost it," and called him a "little f," at which point all three of them went to the car; the Mother drove. Both Respondents again asked what Michael had told the Judge and he again refused. The Mother then asked a third time and each Respondent continued asking what happened. Mr. D. kept raising his voice each time and the Mother told Michael to "shut up, you little piece of s- ." Both Respondents then told Michael that he would have a new mother, not Ms. B., and said they would take him in the car and leave him under a bridge or in a cornfield. The Mother then drove the car to a bridge and told Michael to get out, which he did. At that point, according to this witness, Michael stated that he told the Respondents what he thought they wanted to hear, and they then allowed him back into the automobile. On the way home, they stopped at a Wendy's Restaurant and the Mother told Mr. D. not to buy food for Michael; nevertheless, he did buy him food. The following Sunday after Michael had concluded his visitation with
his Mother and went back to his natural Father, S.R., the Mother told him she was never going to see him again.
According to this witness, Michael's affect was one of concern. He thought his Mother was angry with him and he wanted her to calm down. Michael met with Ms. Marslow three more times. Before Michael met with Judge Joseph, the Mother, right before the Court session, started to "bad mouth" the Father, although Michael did not repeat to this witness what she had said about the Father. Both the Father and Michael had plans to fly to a vacation and the Mother told Michael that she hoped that the plane crashed. The Mother further told Michael that he will "become a serial killer."
[*4]
During the week that Michael had his visitation with his Mother, Mr. D. took him to his work. He is an occupational therapist and visits peoples' homes. Michael told this witness that he was left in Mr. D.'s car, with the air conditioning running, for the week of August 4 through 10, 2003, about three or four times, while Mr. D. attended to his clients in their homes.
Michael further told Ms. Marslow that he had made a decision that he had wanted to live with his Father and further stated that he likes the school that he is presently attending.
This witness then met with the Mother, and then with Mr. D., both on September 11, 2003. Each Respondent denied everything. The Mother stated that Michael is a "liar to everyone;" and Mr. D. questioned why Michael waited two days after the alleged incident to call his Father about what allegedly happened.
Michael further told this witness that each Respondent would listen in to his telephone conversations with the Father, during the visitation week. Furthermore, Michael said that his Mother made him read "all the Court papers" before meeting with Judge Joseph.
While he was in the car, he was upset and crying, as he thought he would in fact be left under a bridge. Michael is now going into eighth grade as of September 2004. Both Respondents stated that Michael is functioning only at a second grade level, in his reading, thought processes, etc. However, Ms. Marslow testified that Michael "appeared age appropriate," and certainly not functioning at a second grade level. The Mother stated she last saw Michael during January 2004, when she met with him; however, she has had no further contact with him.
Ms. Marslow then told the Respondents that this case would be indicated against both and that neglect petitions would be filed against both. At that point in the hearing, the entire Uniform Case Record (UCR) was introduced into evidence, as Pre-sentment Agency's Exhibit I, but writings regarding child support were redacted.
Upon cross-examination by the Mother's attorney, this wit-ness stated that she never checked with the school in order to see whether Michael was functioning on a second grade level or not.
After his meeting with Judge Joseph, Michael was "withdrawn" and went to his room for most of the balance of that date; and he did not want to eat. The Mother told Ms. Marslow that she had asked Michael several times if he wanted to talk, and what was upsetting him, and stated to him "if you want to talk, let me know." The Mother further stated that she knew that Michael wished to live with his Father and she told Michael that it was a hard decision and not to worry about it. The Mother further told Ms. Marslow that Michael is "not always truthful," and that he has had "behavioral issues" in the past.
Lastly, the witness stated she did not contact the school as she did not think it necessary to do so, and that it was "not necessarily prudent" since the school was a "collateral source."
[*5]
Upon cross-examination by the Father's attorney, Ms. Marslow stated that Michael did not tell her what he had told Judge Joseph, and Ms. Marslow never asked him what was said. However, Michael did tell her that Mr. D. had threatened him.
Regarding the automobile incident, Michael told Ms. Marslow that it took "a long while" to get to the bridge and that he was not familiar with the area where the bridge was. Michael did not indicate if he had been left in a cornfield or not. Michael told the Respondents "what they wanted to hear," although on August 25th Michael told this witness that he did not remember specifi-cally what he had told the Respondents. He further confirmed that after he want back into the car, Mr. D. bought him something to eat. Lastly, Michael did not state how long he had been in the car on each occasion when Mr. D. took him to work.
During the Law Guardian's cross-examination of Ms. Marslow, she testified that Michael stated he had been left at a bridge or a cornfield, with no food, alone and no telephone [cell phone]. Her investigation showed the Respondents each denied the allegations, denied that Michael was in a car with them on August 8th, and denied taking him out to eat. Each Respondent stated he/she had taken no "trips" in the automobile on August 8th.
The Mother confirmed to Ms. Marlsow , during her interview, that she had visitation with Michael the week of August 5, 2003 [sic], and that she herself brought Michael to the in camera hearing with Judge Joseph. She stated that it was the school psychologist to whom Michael stated that the Mother made him read the legal papers; she states that Michael did not tell her directly. The Mother's employment is as a physician's assistant and her co-respondent, to whom she is now married, is an occupa-tional therapist.
Mr. D. denied trying to strangle Michael and those allegations are not part of the narrative which this witness wrote and which are contained in the Presentment Agency's Exhibit 1 in evidence (the UCR).
The Mother stated that, in her opinion, Michael "felt guilty" because he had told Judge Joseph he wished to live with his Father. The Mother told Ms. Marslow that she knew about this desire for years previous to the time Michael saw Judge Joseph; it was nothing new.
Mr. D. stated that he felt the Father was the "source of the pressure" on Michael and that the Father was using Michael to "slander" each of the Respondents. The Court finds this witness very credible and well-prepared.
 TESTIMONY OF S.R.
The Presentment Agency's second witness was the natural Father, S.R. Pursuant to an order of this Court dated May 14, 2004, the Father has temporary custody of Michael. That order states nothing regarding visitation, but the Father stated that although he has no objection to the Mother having visitation, she has refused all visitation. As of the date of his testimony (August 5, 2004), Michael is now 13 years old and lives with his Father, together with the [*6]Father's girlfriend. Michael will be entering eighth grade in a month, where he is in special educa-tion, and takes a special speech class twice a week. He is not in Regents classes, but he will be in Regents preparation classes. He further is involved in several extra-curricular activities.
During August 2003, Michael was visiting his Mother for approximately one week. During visitation, Michael would call the Father; the Father received one call either on Thursday or Friday of that week, and Michael was to appear at the Supreme Court on Friday, August 8, 2003 [sic]. The day before that appearance, Michael called and said "Mommy's going crazy." The Father tried to cheer him up and said that he would see him on Sunday. When Michael arrived at the Father's home that Sunday, he was shaking and trembling and had a photo album with him. He said that each of the Respondents had questioned him regarding his Court appearance before Judge Joseph. They wanted to know what he had told the Judge, but Michael would not tell them. He said that the Respondents called him "a little f- " and "a little s- " and that Mr. D. said that he would strangle him. Michael said that these threats escalated and Mr. D. started screaming at him, and the Mother threw clothes at him, stating "you little f -, wiseguy, I am going to take you to a cornfield or a bridge."
Michael further then told the Father that both Respondents drove him to a bridge and wanted him to tell them what he had told Judge Joseph. When he would not tell them, they left him alone, drove away "a little bit," and them came back. Michael told his Father "I don't know why Mommy is doing this to me." He wanted to speak to the Law Guardian, and in fact he did. Shortly thereafter, both the Father and Michael went on vacation together.
At this point, a photo album was introduced into evidence as Presentment Agency's Exhibit II. This album was compiled at the Mother's home and Michael brought it with him when he went back to his Father's home. He said the reason for this was that the Mother did not want to see him again and this album would be his memories of his relationship with his Mother. He stated that his Mother called him "little f - - -" and "little piece of
s - - -," and lastly that "you will grow up to be a serial killer."
According to Michael, relating this to the Father, he stated that Mr. D. had told him that he (Michael) had lost his relationship with his Mother because he did not disclose to her what he had told Judge Joseph. Furthermore, Mr. D. threatened to strangle him unless he told his Mother what happened.
During the week's visitation in August 2003, Mr. D. went to work, using his car, and he took Michael with him in the car while visiting patients. This happened on four or five different days, and Michael was always left in the car.
The Mother further told Michael (who was going on vacation upon his return to his Father) that she hoped his plane crashed. This made Michael so upset he could hardly speak, and he was shaking when he relayed this to the Father.

[*7]
On cross-examination by the Mother's attorney, the Father stated that Michael is "speech impaired" and that he has been classified as "special ed" with grades averaging C.
During cross-examination by Mr. D.'s attorney, the Father stated that Michael has been living with him for the last five years, and also with his girlfriend, L.M., for the past three years. He has been treated by a speech therapist and also a psychological therapist since September 2003.
The visitation which Michael had during August 2003, was pursuant to [Supreme Court] order. The Father is employed in the area of commercial refrigeration and air conditioning and owns his own company.
When Michael came home from his visitation, he had no clothes with him, although he had gone to his Mother's home with his clothes. At no time did Michael ever tell his Father that he did not want to see his Mother.
During the Father's conversation of August 6, 2003 [sic] with Michael, he stated that the threats by the Mother, to go to a bridge or a cornfield, occurred while Mr. D. was present. Immediately after that, the Mother in fact drove him to a bridge, pulled to the side of the bridge and forced him out of the car. The Mother had verbally threatened him in order to get him out of the car; the car then sped away, leaving Michael standing alone near the bridge. He does not know how long he was alone until the Respondents came back. Michael then got back into the car, at which time he disclosed what he had said to Judge Joseph, that "I wanted to live with my Father."
The vacation that the Father and Michael went on had been planned months before; it was a week to ten days in Florida. Michael also told the school counselor or therapist everything that had occurred during September 2003.
During the Law Guardian's cross-examination, the Father testified that he and the Mother were divorced when Michael was eight years old, and that his primary residence always has been with the Father. During the visitations that the Mother had from 1999 until 2002, the Father would call Michael once a week at the Mother's home. However, the Father stopped these telephone calls thereafter because the Mother would listen in on the calls and would bad-mouth the Father to Michael. In addition, Michael thought that Mr. D. was tape recording the conversations.
The Father continued that "in the divorce," the parties had joint legal custody, and thereafter each party filed petitions to change that: the Mother wished to "split" physical custody be- tween the parties and wanted "complete control" over her son.
At the time of the in camera with Judge Joseph, Michael was not in his Father's control because it was during visitation with the Mother. In addition to August 2003, the Mother had one additional week of visitation during July 2003. The visitation was "worked out" at the [*8]Supreme Court during June 2003, and it was shortly after then that the Father purchased the Florida plane tickets.
Michael was to have had Christmas visitation with the Mother during 2003, and Michael and his Father purchased a jewelry box for the Mother, as a Christmas gift. Pursuant to Court order, visitation was to be at Visitation Alternatives, and the Mother was required to be interviewed by that facility initially. The Mother never appeared for the interview, and the Christmas visi-tation never took place.
When Michael returned to the Father after the August 2003 visitation, he was "hysterical crying and upset." For the next ten days he kept "re-visiting" [i.e. discussing, again and again]
the bridge incident and the name calling. In fact, Michael "still talks about this," as recently as June 2004.
According to Michael's IEP [Individualized Educational Pro-file] during the school year 2003 - 2004, he was mandated to speech and occupational therapy and counseling; no special educa-tion was mandated during the summer. For the school year 2004-
2005, he was mandated for speech therapy and counseling. Michael likes school, his behavior is good and he is not taking any medication.
 TESTIMONY OF MARGARET McGRATH
The Presentment Agency's next witness was Margaret McGrath. She has a Master's Degree in social work and is a licensed clinical social worker, certified by New York State and a sole practitioner. She has been seeing Michael since September 2003, at the recommendation of the Father.
The referral was made by the Father because of an alleged traumatic incident involving the Mother and her boyfriend, and the Father thought that he needed to speak to a professional. On the initial date, this witness took a history: Michael told her that both Respondents were angry that he would not tell them what he said to Judge Joseph and they threatened to take his clothes out of the drawer at their home. They then took him to a bridge, where he got out of the automobile. This witness is still seeing Michael on a professional basis, initially every week, and now once a month. Due to the incident, Michael was scared, upset and did not want to see his Mother. He is very anxious about visi-tation and only wants supervised visitation when visiting her. He also does not wish to speak to her on the telephone.
At the initial sessions, Michael was subdued, anxious, school was a struggle, and he was "not in a great place." This should be compared to the date of this witness' testimony (November 8, 2004) when, at his most recent session, Michael was "great," doing well in school and "upbeat."
Michael had said that his Mother's behavior during the incident was "weird" and due to her boyfriend.
[*9]
On cross-examination by Respondents' counsel, this witness stated she never spoke to either Respondent because there was an open CPS case. The Father was never present with this witness when Michael was, and Michael was never present when the Father spoke with this witness. This witness sees her role as a "supportive therapist" for Michael.
Upon cross-examination by the Law Guardian, the witness said she had seen Michael a total of 20 times, up to the date of her testimony. It is unknown how much longer she will have to treat him. The incident was discussed by Michael only during the first or second visit, and he never mentioned it thereafter. He would like supervised visitation only, so that if his Mother got angry, he would be able to leave. In this witness' opinion, Michael feels "safe" living with his Father, and the current situation, where the Father has custody, is a "supportive" one on behalf of the Father.
This Court finds this witness credible.
At that point, the Presentment Agency rested.
 TESTIMONY OF T.D.
The first of Respondents' witnesses to testify was Respon-dent T.D. (formerly known as T.B.).
This witness testified that she and E.D. were married on April 17, 2004. She had visitation with Michael for one week during July 2003 and then an additional week starting August 3, 2003. She testified, day by day, as to her activities, Michael's activities, her work schedule and her husband's work schedule.
On August 5, 2003 she took a day off from work in order to take Michael to Court for the in camera testimony with Judge Joseph. She arrived at 9:00 a.m., and waited one and one-half hours in the hallway until the in camera was completed, at which time she took Michael home. She did not speak to Michael in the car about the in camera, and Michael was joking on the way home. When he arrived home, Michael went right to his room, while the Mother remained in the kitchen. She had asked Michael if every- thing was okay because he seemed upset, and she told him he would be okay, and that "whatever decision you make, that's a good decision because that's a decision you made." Michael played video games that entire day.
Michael did not want to eat that evening, but he came up to watch TV with her. Their only conversation was about a Sponge Bob program that was on TV. They watched TV for about 45 minutes, at which time Michael took a bath and went to bed. The following day, August 6, 2003, she went to work until 1:00 p.m., while her (now) husband was home. The Mother and Michael played Monopoly while Mr. D. worked on the computer. At 3:00 p.m. they went to the arcade at Jillian's near Roosevelt Field.
On the day Michael saw Judge Joseph, he was with both this witness and her husband in the Supreme Court, from 8:00 a.m.
[*10]
until 12:00 noon. They left Court about noon or 12:30 p.m. and went home. There was no conversation between them regarding the Court proceeding and when the Mother arrived home that evening, Michael simply relayed to her his activities with Mr. D. All three of them went to Applebee's and the movies. There was no discussion regarding the Court proceedings, only "general conver- sation." The following day, August 9, 2003 [sic], a Saturday, Michael went to his Tai Kwon Do class, tennis and private golf lessons, and then to Bertucci's to celebrate his Grandmother's birthday.
Regarding the dinner at Bertucci's on August 9, 2003 for the Grandmother's birthday, Michael was present and was laughing and talking with everyone. He seemed "okay" and there were no prob-lems. Thereafter, everyone went to the Mother's apartment in Westbury (where she lived at the time) where they ate birthday cake from Carvel and were there several hours. Michael seemed "normal;" he was talking and laughing.
The following day, August 10, 2003 [a Sunday] in the morning, the Mother drove Michael to his private golf lessons. He remained there an hour and then they came home, made cookies, played Monopoly, and then Michael read for 45 minutes; he was having a good time, was happy and he loves to cook (i.e. cookies, etc.). Mr. D. was also there. They also made a photo album on Saturday and Sunday which Michael took back with him as he had to be back to his Father by 6:00 p.m. During the drive home, there was conversation in the car consisting of small talk. Michael's demeanor was "fine," he was not in distress and they discussed what they had done over the weekend. Despite what the Father testified to, and what he told CPS, Michael was not crying or trembling when he came back to the Father. The Mother never called Michael any names and never said he was a serial killer.
The Mother attributes the serial killer phrase to the following: during approximately 2000, there was a discussion between the Mother and the Father regarding a serial killer. The Mother was discussing Michael's behavior with the Father, and she said he had been withdrawn from other children and was more com- fortable with adults. She said that in her psychology class they had been discussing Jeffrey Dahmer (a known serial killer) who (in the Mother's opinion), exhibited the same behavior as Michael. The Father was the one who used the term "serial killer." The Mother said it was not the same, but she was con- cerned because the Father was "blowing it off." Therefore, she tried to make the Father understand her concerns, referring to Jeffrey Dahmer.
Until 2003, Michael was classified as speech and language delayed, but high functioning, and had trouble with reading com- prehension and math skills. He was progressing in his social skills, and had some peer problems. He was acting out, but became better as time progressed.
The Mother denies the allegations of the petition, that she threw Michael's clothes out of a drawer; she never threatened to take him to a bridge or a cornfield; and she never did in fact take him to a bridge or a cornfield. She also stated that she never questioned Michael regarding the in camera with Judge Joseph, and where he wanted to live.
[*11]
On cross-examination of the Mother by the Presentment Agency, the Mother testified as to her specific work schedule for her visitation time the week of August 3, 2003, together with Mr. D.'s schedule. She recited all of the activities she did with Michael each day (which were numerous) including a movie, Pirates of the Carribean, which she saw with him on Saturday, August 9th, at the Lowe's theater in Levittown.
On the date of the in camera with Judge Joseph, August 5th, after they returned home Michael stayed in his room (in the Westbury apartment), and did not want to talk to the Mother. However, he went in and out of his room until dinner time, which was approximately 5:00 p.m. The Mother asked Michael if he wanted to talk, and if there was anything she could do; she thought Michael was upset and told him not to worry, "as long as you told the truth." However, Michael wanted to be alone and only left his room to get water, etc.
On the evening of August 5th, both the Mother, Mr. D. and Michael all went to Applebee's for dinner.
The Mother had gone in to speak to Michael on August 5th approximately every hour. He was coloring and said "I am okay." The Mother denies that she ever told the CPS worker that Michael was a liar. The last time the Mother saw Michael was at the end of the visitation, on the weekend of August 9, 2003.
The attorney for Mr. D. then cross-examined the Mother. On the day they went to Court to meet Judge Joseph, August 5th, the Mother took Michael. There was no conversation in the car regarding Court. When they left the courtroom, Michael was smiling, was talking to his Mother and was joking about some-thing. It took about 20 minutes to get home. At no time did the Mother question Michael and Michael said nothing about the Court appearance.
On August 9th at the dinner at Bertucci's, Michael spoke to everyone present. No one discussed Michael's appearance before Judge Joseph and the Grandmother never asked about it. When they came home for birthday cake at the apartment, Michael appeared happy, not withdrawn, was "normal," and was happy celebrating his Grandmother's birthday.
At no time during the week of visitation did Michael ever tell the Mother that Mr. D. had taken him to a job at one of his client's homes, nor that he had ever left him in the car.
On August 10th when the Mother had Mr. D. take Michael to the Father, the automobile ride took approximately 15 minutes. While they were in the car there was "light conversation" with Michael; he was not crying, not fearful, not trembling, etc.

Counsel then asked about the serial killer allegations. The Mother said it was the Father who said this. The Mother said, after reviewing Michael's behavior in the presence of other children (that he was withdrawn and alone, for instance on a playground), the Father said "what are you saying, our child is a serial killer?" The Mother denied that she ever stated that Michael would grow up to be a serial killer.
[*12]
Within a few days of August 10th (upon return to the Father) the Mother receiveda telephone message from Michael, stating "Hi, Mom. I am in Florida at the Hard Rock Café with Dad, every-thing is okay." He sounded happy and did not sound as if he were trembling.
Upon cross-examination by the Law Guardian, the Mother stated that her visitation week of August 3rd through August 10th, 2003 was not in the parties' divorce agreement (i.e. it was "extra" time to the Mother). Regarding the dinner at Jillian's, it was one night after the Mother returned home from work; she thinks it was Monday, August 4th. Mr. D. told her that he took Michael out every morning for breakfast after the Mother left for work.
She admitted that she has tape recorded telephone calls from her home. The parents were divorced in 2000 and the Father always had custody. On August 8, 2003, the parties appeared before Judge Joseph; there was to be a hearing regarding modifi-cation of the visitation portion of the divorce decree. The Mother wanted to change the custody arrangement and specifically wanted "shared" custody and to have the final say regarding schooling and education.
Regarding the photo album, this had been "a project" she and Michael were working on "for several months on and off." The Mother stated that she understood that the Father did not want pictures of her in frames at his home, and Michael thought that an album might be okay. At no time did the Mother ever tell Michael, in effect: "Here are the pictures. You will never see me again." Mr. D. is a licensed occupational therapist, was employed at Parker Jewish Hospital at an earlier time, but as of August 2003 he did home care.
As of August 2003, Michael had a "good relationship" with his maternal Grandmother.
Regarding the in camera of August 2003, the Mother stated she was told by the Law Guardian and others that Michael was going to Court so that he could give his decision as to who he wanted to live with. Upon their return home after Michael saw Judge Joseph, Michael looked upset. The Mother asked him "is everything okay?" and she further stated, "whatever your decision is, it's your decision." At no time did she ever ask him, prior to the in camera, what he would say to Judge Joseph.
She stated the parties were divorced on January 13, 2000. The last time she saw Michael was August 10, 2003 and she refer-red to Judge Joseph's order of September 3, 2003 (that order states visitation was temporarily suspended between Michael and the Mother, due to the fact that the CPS report was incomplete, and pending a further conference). On re-direct examination, the Mother stated that she did not tape any telephone calls Michael had made.
On re-direct examination by the Father's attorney, the Mother stated that there was a tape recorder, which was only used to tape from the office phone (located in the house) and not the other phones in the house, including any telephone Michael would have used to make calls.
Neither Michael nor Mr. D. ever told the Mother that Michael went to work with Mr. D.
[*13]
Upon cross-examination by the Deputy County Attorney, the Mother stated she had tape recorded phone calls with the Father, approximately July 2002 or August 2002 because the custody case, before Judge Joseph, was coming on during November 2002. She believes that the Father in fact thought he was being taped. The last conversation the Mother and Father had was approximately late July 2003 and the Mother stopped taping at that last conver- sation.
 TESTIMONY OF DR. MARYANNE LEONE
The Mother's next witness was to be Dr. Maryanne Leone. After discussion with counsel, a proffer was made by the Mother's attorney, as to why Dr. Leone would be called to testify and what her testimony would be vis-a-vis the allegations before the Court. The proffer by counsel (transcript of May 4, 2005 page 28 - -the lines have not been numbered by the reporter) is that the witness would testify as to Michael's ability to understand, memory [sic], communicate, all of the issues that are very relevant to this case. Particularly since, as your [sic] Honor pointed out, Article ten has to do with this child to articulate the events [sic]. However, there was a problem with the perception, memory and communication...I have Mary Ann Leoni [sic], who is a psychologist for the school with the records in place [sic].
Later on in that same transcript, at page 31, the Mother's attorney stated, as to Dr. Leone, "She had observation as to Michael's ability, memory and comprehension and articulation. The Court should be aware of that in terms of assessing the merits of this case."
Further, again at page 31 of that same transcript, the Mother's attorney stated that Dr. Leone, and her records, are "relevant to Michael's ability to present his story. We should have the right to look at them [the records] and put the witness on if they are relevant."
The record, both on May 4, 2005 and other dates, regarding Dr. Maryanne Leone's testimony, and colloquy between the Court and counsel, shows that after Dr. Leone had testified, the Court stated that she testified "exactly opposite" to that which was made by the proffer. The whole purpose of Dr. Leone's testimony, according to the Mother's attorney, was to report to the Court Michael's ability to relay or report incidents which had pre-viously happened to him, ie., the alleged incidents at issue in the matter at bar.
At the end of Dr. Leone's testimony, the Court stated that none of her testimony was relevant, and that the testimony which was taken, and which was all subject to connection, was stricken in its entirety, as no connection had been shown. In addition, and as set forth above, at no time did Dr. Leone testify as to anything mentioned in the proffer, but rather, the complete opposite.
 TESTIMONY OF E.D.
The Co-Respondent's first witness was E.D. himself. His testimony commenced June 17, 2005. He is a licensed occupational therapist, and was so licensed during the week at issue, in August 2003. At that time he did home care for individuals whose ages ranged from babies until [*14]age three.
Mr. D. and the Mother have lived together since 2000 or 2001, to the present, originally in Westbury, and now in Howard Beach, Queens, New York. When Michael visited, he had his own room and during August 2003 he considered his relationship with Michael as "friends" as Michael "already had a father." Mr. D. and Michael did a lot of different activities together; Michael was "distant with his peers." During a visitation in July 2003, the Mother and Michael (only) went to Las Vegas for a week; Mr. D. did not accompany them.
This witness then testified at great length as to every single day during the week starting August 4, 2003, concerning the Mother's schedule, Mr. D.'s schedule, and the various patients Mr. D. saw during that week. At no time did Mr. D. ever bring Michael to his work.
Mr. D. stated that he gave the CPS worker, Ms. Marslow, his list of home care cases in order for her to check it out. This list consisted of 20-30 names and he states that Ms. Marslow then returned the list to him and said "it was not necessary." This witness stated that he never stated that Michael would lose his relationship with the Mother, nor did he ever choke Michael. The Mother never threatened Michael, never called him names and never stated he would become a serial killer when he became older. On August 7, 2003, he went with Michael to rent a video at Block-buster and they also went to Trader Joe's. For lunch they went to Applebee's. Admitted into evidence as E.D.'s Exhibit A was his MBNA credit card statement for the period July 28, 2003 - August 13, 2003, which shows, for August 7, 2003, purchases at Blockbuster, Applebee's and Trader Joe's.
Entered into evidence as Respondent E.D.'s Exhibit B were four pages of his "daily notes," indicating his home care visits for the week commencing August 3, 2003. He testified as to the names of the various children he saw in his professional capac-ity, and the times of their therapy.
Upon cross-examination by the Deputy County Attorney, he testified that he currently is prohibited from working for any "child agencies" because he has an indicated CPS case against him. He was advised of this approximately mid 2003 by a case manager from the Department of Social Services. He then called one of these agencies, who stated he could not work with children until the lawsuit had been completed; he contacted "New York State" and confirmed this. He further testified that he was indicated for both neglect and abuse, and that six to eight weeks after he was orally notified, he received a letter to that effect in the mail from CPS. Accordingly, he now is employed as a occupational therapist by the New York City Department of Education, District 26, Glen Oaks, Queens, New York; this is a full-time position.
He states that Michael is "anti-social" with children his own age, in that he does not interact with them. Michael could not remember the other children's names, and when he asked them their names, they teased him. At that time (Mr. D. testified), the Respondents told him that the other children were simply joking and that this was harmless; however, Michael was "hurt" by this. From August 4 until August 9, 2003, Mr. D. took Michael to golf, Tai Kwon Do and [*15]played video games with him, as well as taking him to Applebee's for lunch on August 7th. He did not accompany Michael to court to see Judge Joseph.
After the in camera on August 5th, Mr. D. waited for them at home and they arrived approximately 12 noon or 1:00 p.m. Michael seemed upset "and was very quiet" and went to his room. Mr. D., who was in the living room, asked the Mother "how did it go?" and she responded, "I don't know." The following two days, Michael acted "like nothing happened." Mr. D. never discussed with Michael what happened at court, nor did Michael discuss it with him. The Mother never yelled at Michael then, and in fact she never yells.
He characterized his relationship with Michael as "a friend," as he realizes he is not a parent and it is not his place to be a parent. He believes that his relationship is more "like an older brother."
He only had one conversation with Ms. Marslow; that was when he gave her a list of his clients saw the week of August 3rd, if in fact she wanted to see them or speak with them.
On cross-examination by the Mother's attorney, Mr. D. stated he did not go to Michael's room on August 5th, after he returned from court, because it was the Mother's place to do so, as the Mother. He stated that the Mother always had come home from (Supreme) court depressed and upset.
Upon cross-examination by the Law Guardian, Mr. D. stated that he offered to provide 30-40 names of his private clients to Ms. Marslow. He further testified that he found out in 2004 that CPS had indicated him, although he did not know when. He was interviewed by Ms. Marslow in his apartment in Westbury for only one hour.
Regarding Michael's allegations, which are the subject of this petition, Mr. D. told Ms. Marslow that he felt the Father was "feeding" Michael the whole story, and that the Father was controlling the entire matter, in order to hurt Mr. D.'s relationship with the Mother, and in order to hurt Mr. D. finan-cially (since due to the CPS indicated case he could no longer treat children).
The Court does not find this testimony credible. Further-more, at this point, Mr. D. became angry, raised his voice and the Court had to ask him to calm down. This was far from the first time Mr. D. had heard these allegations (the date of this testimony was July 21, 2005 or almost two full years subsequent to the date of the original allegations). For Mr. D. to become so agitated on the witness stand, seems to this Court to be melo- dramatic and merely playing to the Court. On the other hand, if cross-examination and testimony like this would cause him to be so angry, then this tends to lend credibility to Michael's allegations.
After this episode on the witness stand, Mr. D. stated he felt that the Father was trying to "slander" him because his primary income was from children, and he was trying to hurt his occupation.
[*16]
Thereafter, Mr. D. testified at great length, day by day, as to his activities, and his interaction with Michael. Regarding August 5th, upon his return from Court, Michael "looked very quiet, not himself," and he stayed in his room the entire day.
On August 8th, only the Mother went to Court with Michael, before Judge Joseph, and returned home approximately 12:00 noon 1:00 p.m. All three had lunch together at the home, went to the movies where they saw Pirates of the Carribean and then went to Applebee's.
On Saturday, August 9th, they all planned for Michael's Grandmother's birthday, going to the Party Store and Carvel for ice cream cake. They decorated the home, wrapped gifts, and went to Bertucci's for a birthday dinner - all three of them plus the Grandmother.
During the weekend, the Mother made a picture album for Michael. Mr. D. printed out pictures from the computer of any animals they had as pets; however he printed out nothing else. This album was a project that Michael and the Mother had been working on for several months.
During the week of August 3rd, Mr. D. does not know if Michael and the Mother went to Jillian's Restaurant or not; however, Mr. D. never did go to Jillian's. On Wednesday, August 6th, the Father called Mr. D. on his cell phone and this witness then gave Michael the phone.
Mr. D. became aware that the Mother was taping the Father's conversations; however, Michael was not present when this was done.
On re-direct examination of Mr. D. by his attorney, he testified that he (Mr. D.) told Ms. Marslow particulars of how the Father was "feeding information" to Michael. Although Mr. D. offered the names of 20-30 people, consisting of his patients, in order to interview them, she did not take down the names.
On August 10th, Michael was taken back to his Father's home, at the end of visitation, and Mr. D. was there. Several days later, Michael called the Mother's cell phone and left a message, which Mr. D. listened to. The message stated, "Hi, Mom. I love you, I am in the Hard Rock Café in Florida, see you soon."
Upon re-cross-examination by the Law Guardian, Mr. D. said that on August 5th, by dinner time, Michael's mood was "okay;" he was less withdrawn and was sitting in the living room with his Mother watching TV; and by August 6th, he was "okay again."
In this Court's opinion, the purpose of Mr. D.'s testimony was to attempt to show to the Court that during the week of visitation, things were "normal:" Michael, his Mother and Mr. D. all did the usual things with Michael that they would do any other time; the only thing different was the day of the in camera, when Michael came home, was quiet and spent the day in his room. Otherwise, they did sports activities, went out to breakfast and dinner and basically did everything else they normally do during any visitation week.
 TESTIMONY OF R.B.
[*17]
Mr. D.'s next witness was R.B. During 2003, he was treating this witness' son, Kevin, in occupational therapy and at Kevin's home, approximately 3-4 times a week. This witness personally saw Mr. D. on those occasions, and helped him with his tools and books, taking them from the car to the home. At no time did he ever see anyone in the car with Mr D. At the end of each session this witness would help Mr. D. to the car with the tools and books, and again, he never saw anyone else in his car. He would go to the car, two or three out of every four times that there was a session with his son.
On cross-examination by the Law Guardian, this witness admitted that he did not know specifically if Mr. D. visited his home the week of August 5, 2003 or not, because it was two years ago. A parent had to sign a sheet for Mr. D., at each session to confirm he was there. One of Kevin's parents was always home when the session ended, and the form would be signed.
On re-direct examination by Mr. D.'s attorney, this witness was shown Respondent E.D.'s B in evidence, for August 3, 2003, which were the "daily notes" of Mr. D., regarding his home visits. The witness testified that the signature was that of J.V., and that he recognized that witness' signature. That was the same signature for August 5th as well as August 6, 2003. He then testified that he helped Mr. D. with his things at the end of every session, every time, and never saw anyone else in the car.
On re-cross examination by the Law Guardian, this witness stated that sometimes he saw the mother sign the sheets and sometimes not, and sometimes he signed the sheets and sometimes not.
Lastly, on re-re-direct examination, the witness stated that in fact he could not state if Mr. D. was at his home to treat Kevin on any particular day (as this was two years ago, from the date of his testimony, which was September 7, 2005).
 TESTIMONY OF K.P.
Mr. D.'s next witness was K.P. This witness testified that Mr. D. was the occupational therapist for his son, Shawn, and that he treated his son during August 2003, two times a week in the evening, with each session lasting 45 minutes. He sometimes saw Mr. D. pull up to his home and never saw anyone else in the vehicle. Mr. D. brought everything into the house himself (toys, puzzles and sensory equipment) and this witness never helped him with it. Regarding the week of August 5, 2003, since it was so long ago (the date of this witness' testimony being September 7, 2005) this witness does not remember the specific dates Mr. D. came to his home.
 TESTIMONY OF L.B.
Mr. D.'s final witness was L.B. She is the Grandmother of Michael A., and mother of T.D. To celebrate her birthday on August 9, 2003, a Saturday (her birthday was actually two days later) she went to the Respondents' apartment, waited for them to get ready and then went to Bertucci's in Westbury for the cele-bration. She stated "Michael is not a real communicative [*18]person, he would speak to me a little."
On cross-examination by the Deputy County Attorney, she stated that Michael "seemed like he usually is or was."
On cross-examination by the Mother's attorney, she stated that Michael never indicated he was ever mistreated during the week of his visitation, either by his Mother or by Mr. D. Furthermore, he never mentioned anything about being left at a bridge.
Although the Court finds this witness credible, she was extremely hazy regarding details, and of no real assistance to the Court in the decision it must make in this matter.
 TESTIMONY OF MARGARET MARSLOW
The Presentment Agency presented as its rebuttal witness, Margaret Marslow (who was the very first witness at the beginning of this hearing). Her date of testimony was October 6, 2005. She testified that at no time was she given any list of names by either Respondent, she heard no auditory tape of any conversation with the Father and Michael and none was ever mentioned by either Respondent. Michael did not mention to her, during her two interviews with him, any of the activities that he did during the week in question.
On cross-examination by the Mother's attorney, this witness stated that she did not specifically ask Michael if he had gone to any birthday parties or what activities he did that week.
 TESTIMONY OF MICHAEL A.
On January 17, 2006, this Court heard Michael A. in camera. Due to the nature of such testimony, this Court will not review, in this decision, any of such testimony. (See Lincoln v Lincoln, 24 NY2d 270 (1969).)
 MEMORANDA OF LAW
As set forth at the beginning of this Decision and Order, subsequent to the conclusion of testimony, counsel, with the Court's permission, submitted memoranda of law. They may be summarized as follows:
The Presentment Agency's memorandum stresses that a neglect finding may be had against any person "legally responsible" for the child, in accordance with Family Court Act §1012(g). Since Michael spent his vacation week during August 2003 with both his Mother and his Mother's then live-in boyfriend (now husband), and since he was continually in the home for that week, E.D. should be found to be such a person legally responsible.
The Presentment Agency further argues that, in accordance with case law, a neglected [*19]child need not have a physical injury; if a child's physical, mental and/or emotional condition is in imminent danger of being impaired as a result of the failure of his parent substitute (i.e. Mr. D.) to exercise a minimum degree of care, then that is sufficient to sustain a finding of neglect. This occurs when a person fails to provide the child with proper supervision or guardianship. Here, the Agency argues that sub- sequent to the brow-beating Michael sustained by the Respondents, in an attempt to have him divulge what he told to Judge Joseph, and as a result of his failure to discuss any such thing, he was left at a bridge; the Agency argues that the effects of this are long lasting. Upon Michael's arrival, at the end of visitation week, at his Father's home, he was trembling, shaking and crying, and was "unconsolable [sic] and distraught." In addition, Michael then called his Law Guardian and told her what had happened, in order to secure assistance. Ms. McGrath testified that, when he told her about what happened, he "got very shaky.
He got very panicky." In addition, he feared for his safety and stated that he would no longer see his Mother alone, because if she got angry there would be no one to help him. It is argued that the acts of neglect and their ramifications continued far after the bridge incident.
The memorandum submitted on behalf of Respondent E.D. con- cedes that "petitioner may have established a prima facie case of abuse based on out of court statements of the child." However, that Respondent submits that the prima facie case was "rebutted by both respondents." (This Court notes that the matter at bar alleges neglect, not abuse.)
Mr. D. argues that there has not been the necessary cor-
roboration pursuant to Family Court Act §1046(a)(vi). In parti-cular, he stresses that Michael's Grandmother was not informed by Michael of any acts of abuse or neglect; and that the Court's inquiry must deal with whether the child's statements to various people are consistent.
Mr. D. further argues that:
Here, there were no repeated allegations of abuse and certainly no independent corroboration of any other individual. Essentially, the case of petitioner is a "one witness case", as all testimony in support of petitioner's case relates back to the child.There has been no testimony concerning a history of abuse or neglect which could corroborate the statements of the child.
Lastly, he argues that no "validator" was produced, and for this reason the testimony of the therapist, Ms. McGrath, is pre- cluded and cannot be considered by this Court for corroboration, and that since no validation witness was produced, that the necessary corroboration is missing. In the alternative, he argues that an adjournment in contemplation of dismissal might be appropriate.
As set forth at the beginning of this Decision and Order, counsel for the Mother submitted his memorandum. However, and despite two oral requests and one written request from chambers, he did not submit an affidavit of service, showing that all other counsel were [*20]served with that memorandum. Accordingly, that sub- mission will not be considered by the Court nor has it even been shown to the Court.
The memorandum by the Law Guardian states that the allega-tions against the Respondents have in fact been proven, and that there was a course of conduct by the Respondents during the entire week of August 6, 2003 through August 10, 2003, which threatened or impaired the mental, emotional or physical condition of the child. FCA §1012(f)(i)(A). She further stresses that there were "indicated cases" against both Respondents prior to the filing of the instant petition, and that the Uniform Case Record, admitted into evidence, contains this information.
She stresses that the acts or omissions which can lead to a neglect finding, are set forth in Family Court Act §1012(f)and (i), (A) and (B).
Citing In re Christine II, [13 AD3d 922, 3d Dept 2004], the Law Guardian states that the matter at bar is strikingly similar to Christine II in which the trial court found neglect and this was affirmed by the Appellate Division. Furthermore, the Law Guardian states both the Father and Ms. McGrath, the social worker, testified about Michael's behavioral changes and the level of distress exhibited by him when he related to them what occurred during his visitation.
 ANALYSIS
As with many cases before this Court, the matter at bar revolves around the question of credibility. In this, the Court finds that the Mother's upset near the very end of the proceed-
ings, for the first time and after one and one-half years before
this Court on trial, was staged. Likewise, Mr. D.'s loss of control and visible anger during cross-examination, in this Court's opinion, was staged. The Court's beliefs are strength-ened by the fact that, generally speaking, each of the two Respondents conducted herself and himself appropriately through- out virtually all of the proceedings.
Family Court Act §1046(a)(vi) allows what would otherwise be hearsay, to be admitted into evidence in a neglect proceeding. Here, Margaret Marslow, S.R. and Margaret McGrath all testified that Michael told them about the Mother's and Mr. D.'s threats to him to divulge what he had told Judge Joseph in the in camera; and the incident whereby he was taken by automobile by the Respondents to a bridge and left there. FCA §1046(a)(vi) further requires corroboration of any such statements, and where a child has repeated the same story to different people at different times, mere repetition of an accusation by a child in such cir- cumstances is not sufficient corroboration. In re Zachariah V., 262 AD2d 719 (3d Dept 1999).
In addition, in those instances where Michael told the person of those allegations, and that person then repeated the allegations to a witness (such as the Father's statements to Ms. Marslow of what Michael had told him, what is usually denominated by attorneys as "double hearsay,"), such testimony is properly submitted to the Court. In re Sueann B., 258 AD2d 930 (4th Dept 1999); In re Roseanne G., 256 AD2d 76 (1st Dept 1998); In re Elizabeth G., 255 AD2d [*21]1010 (4th Dept 1998), appeal dis'd 93 NY2d 848 (1999), appeal den'd 93 NY2d 814 (1999); and Matter of Akia KK, 282 AD2d 839 (3d Dept 2001).
The trial court has broad discretion to determine whether a child's statement has been corroborated. In re Russell B., 257 AD2d 707 (3d Dept 1999); In re Heidi "CC.," 270 AD2d 528 (3d Dept 2000); and Baxter v Perico, 288 AD2d 717 (3d Dept 2001).
Here, the corroboration necessary is that supplied by Michael himself, when he testified in camera. In re Child Protective Services (Darrell Mc.), 230 AD2d 733 (2d Dept 1996); and In re Christina BB., 291 AD2d 738 (3d Dept 2002), appeal den'd 98 NY2d 605 (2002). The Court finds that his testimony was extremely credible regarding the salient allegations. Further- more, the Court was impressed by the testimony of Margaret McGrath, who stated that although Michael had initially told her of the incidents which are alleged in paragraphs 4b and 4e, that he was very reluctant to discuss it thereafter, and in fact never mentioned it again. All this makes Michael an extremely credible witness. Also, the fact that Michael did not know the specific dates, times nor length of each time he was left in Mr. D.'s automobile while Mr. D. was visiting his patients, shows this Court that Michael was not "programmed" by the Father.

Although mentioned by the Presentment Agency in its memorandum of law, and not contested by Respondent D., in order for there to be an affirmative finding against a respondent, pursuant to FCA §1012(a) and (g), the respondent must be "a person legally responsible for a child's care." Such a person is one acting in loco parentis or as the functional equivalent of a parent in a household setting (what the Presentment Agency herein, in its petition, calls a "parent substitute"); such a person can even be a babysitter. In re Nathaniel "TT," 265 AD2d 611 (3d Dept 1999), appeal den'd 94 NY2d 757 (1999). This Court finds E.D. to be "a person legally responsible."
Mr. D.'s memorandum urges that one single incident (i.e. the bridge incident, assuming arguendo that it occurred) is not suf-ficient for a neglect finding. However, this is not the law in this State. See, for example, In re Barbara S., 244 AD2d 556 (2d Dept 1997); Matter of Joseph T., NYLJ 6/22/99 p 36, col 3 (Family Court of New York, Suffolk County); In re Scott M., 284 AD2d 589 (3d Dept 2001); In re Pedro C., 1 AD3d 267 (1st Dept 2003); and In re Mayabelle F., 5 AD3d 768 (2d Dept 2004). Furthermore, no actual physical injury is necessary in order to prove neglect. In re Scott M., supra.
Despite this contention of the Respondent, this Court finds that in fact there was not one single incident, but rather a course of conduct by each and both Respondents, consisting of threats and acts from August 5, 2003 through December 10, 2003.
In his memorandum of law, Mr. D. also states that the Presentment Agency must have a validator testify as part of its prima facie case. However, he gives no authority for this, and this proposition is simply incorrect. See, for example, In the Matter of Sara KK., 226 AD2d 766 (3d Dept 1996).
[*22]
As to Mr. D.'s witnesses, R.B. and K.P., the Court finds them credible. However, they could not recount specific days that Mr. D. visited their children, due to the lapse of time between the occurrences and their testimony. Furthermore, these two witnesses were only two of 20 or 30 cases Mr. D. had at the time, and there is no proof (other than Mr. D.'s own denials) of what happened the other days and other time periods, during the week in question.
This Court finds each of the Presentment Agency's witnesses extremely credible, and does not find either of the Respondents credible whatsoever.
If, in fact, as the Respondents urge, the Father or even Michael was behind a scenario to ensure that the Father received full custody and/or that E.D.'s employment would suffer, then Michael would have continually spoken about the incident. How- ever, this simply did not occur.
 FINDINGS
All findings in this Decision and Order are by a fair preponderance of the evidence (FCA §1046(b)). The following findings are made with respect to each allegation of the amended petition:
4a: As stated at the beginning of this decision, the "allegations" are simply "boiler plate" and an introductory paragraph; accordingly, there cannot be any finding nor dismissal.
4b: The Court makes an affirmative finding with respect to every allegation in this paragraph. (From this Court's review of the testimony and exhibits in evidence, this Court notes that the actual date of the in camera was in fact August 5, 2003. This Court is well aware that the testimony of various witnesses gave different dates of that in camera, although all dates given were within one or two days of the actual date of the interview. Since the allegation is "on or about 8/6/03," the Court makes this affirmative finding, as any testimony at variance with the actual in camera date is inconsequential and irrelevant.)
4c: The Court makes an affirmative finding with respect to every allegation of this paragraph.
4d: The Court makes an affirmative finding with respect to every allegation of this paragraph.
4e: The first sentence of this allegation is dismissed, for failure of proof, as is so much of the third sentence as alleges
"a few feet." The Court makes an affirmative finding with respect to every other part of this paragraph.
4f: The Court makes an affirmative finding to the following
extent: the child stated that during the week of August 3, 2003, the Respondent parent substitute D. drove him around to his job where he sees clients in their homes. Respondent parent substi-tute D.'s behavior and lack of supervision placed the child in imminent danger.
4g: The Court makes an affirmative finding with respect to the first sentence of this paragraph. The second sentence of this paragraph is dismissed for a failure of proof.
[*23]
4i: The allegations contained in this paragraph, even if true, do not allege neglect , and accordingly are dismissed.
4j: The allegations contained in this paragraph, even if true, do not allege neglect, and accordingly are dismissed.
4k: The allegations contained in this paragraph, even if true, do not allege neglect, and accordingly are dismissed.
Accordingly, it is ORDERED, that the parties and counsel shall appear before this Court on June 21, 2006 at 9:00 a.m., for a pre-disposition conference. This constitutes the Findings, Decision and Order of the Court.
Dated: Westbury, New York
 June 7, 2006
 E N T E R:
 HON. RICHARD S. LAWRENCE, J.F.C.